## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ALTERRA AMERICA INS. CO.,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | **NO. 15-3665** |
| | : | |
| **DAILY EXPRESS, INC., et al.** | : | |
| **Defendants** | : | |

## M E M O R A N D U M

**STENGEL, C. J.**                                                   **September  5, 2017**

This is an action under the Carmack Amendment, a federal law regulating interstate shipping.  Plaintiff Alterra America Insurance Company, brings its claim as the subrogee of Dozier Crane & Machinery, Inc. ("Dozier Crane"), a company that sells and leases construction equipment.  In the Spring of 2014, Dozier Crane hired Defendant Daily Express, Inc. ("DXI"), to transport several components of a crane from Iowa to Georgia.  Near the end of the trip, the defendant's driver discovered that one of the components had been damaged.  The plaintiff is seeking compensation for the cost of the damaged part.

The parties have filed cross motions for summary judgment:  the plaintiff requests partial summary judgment on its *prima facie* case and the defendant moves for summary judgment in full.  For the following reasons, I will grant the plaintiff's motion and deny the defendant's motion.

# BACKGROUND

In the Spring of 2014, Dozier Crane bought a crane and several boom components from RTL Equipment, Inc., a company that, like Dozier Crane, sells and leases construction equipment. (Pl.'s Mot. for Part. Summ. J. Ex. D (Goodwin Dep.) 7:16–18, Doc. No. 43-7; <u>id.</u> Ex. C (Email Chain, Mar. 31, 2014), Doc. No. 43-6; <u>id.</u> Ex. A (Watson Dep.) 10:11–18, Doc. No. 43-3.) Dozier Crane then hired DXI, a carrier, to transport the parts from two RTL facilities in Iowa to two of Dozier Crane's customers' facilities in South Carolina and Georgia. (Watson Dep. 10:11–18).

Steven Wilkinson, a truck driver for the defendant, picked up the boom components from RTL on April 1, 2014, in Grimes, Iowa. (<u>Id.</u> Ex. H (Wilkinson Dep.) 7:20–9:12, Doc. No. 43-10). He looked over the parts and saw no damage. <u>Id.</u> at 12:23–13:4, 13:20–14:13, 15:4–15. He signed a bill of lading,[1] and did not note any damage. (Def.'s Mot. for Summ. J. 24 & Ex. D (Grimes Bill of Lading, Apr. 1, 2014), Doc. No. 53-4.)[2] The bill of lading stated that the shipper "hereby certifies that he is familiar" with and agrees to the carrier's applicable tariffs. <u>Id.</u> One of those tariffs stated that the

---

[1] "The bill of lading operates as both the receipt and the basic transportation contract between the shipper-consignor and the carrier." <u>EF Operating Corp. v. Am. Bldgs.</u>, 993 F.2d 1046, 1050 (3d Cir. 1993).

[2] The plaintiff states that it attached the Grimes bill of lading as Exhibit E (Pl.'s Mot. for Part. Summ. J. 3), but both the bills of lading attached to the plaintiff's motion describe parts picked up in Swisher, Iowa, and neither lists a forty-foot boom. (<u>Id.</u> Ex. E, Doc. Nos. 43-8 & 43-9.) The defendant argues that the plaintiff refers to the incorrect bill of lading and presents instead a bill of lading from Grimes, Iowa that notes a forty-foot boom. (Def.'s Mot. for Summ. J. 20 n.2 (arguing that the correct bill of lading was marked by the defendant's claims adjuster Vicki Witter during her deposition as Document 7b) & Ex. 9 (Witter Dep.) 68:14–69:18, Doc. No. 53-9; Grimes Bill of Lading, Doc. No. 53-4 (including a handwritten mark of "7B" in the top right corner).) The plaintiff has not contested the bill of lading that the defendant presents. Regardless, all the referenced bills of lading state that the shipper agrees to the carrier's tariffs.

carrier's liability was limited to $5,000 per ton of cargo weight. (Id. & Ex. E (Tariff: Released Value—Released Rates, Item 848-15, issued Sept. 19, 1995, revised Mar. 1, 2012), Doc. No. 53-5).

While loading the truck, Wilkinson observed that the ties meant to prevent a large cable that ran through the boom from swinging or rubbing against the other equipment appeared inadequate for the task. (Wilkinson Dep. 17:2–11, 39:10–20). The straps were narrow plastic zip ties. Id. at 17:1–11. Wilkinson voiced his concern to the RTL employees and they reportedly replied, "That's the way we always do it." Id. at 39:17.

During the drive, Wilkinson frequently checked that the load was secure. (Wilkinson Dep. 96:5–97:17). He did not notice that anything was loose or broken until he arrived in South Carolina. Id. at 43:10–15, 48:21–49:24, 52:2–53:14. There, after removing some of the parts from his truck, he saw a rub mark on the boom and a cable hanging beside the mark. (Id. at 35:15–36:21; Pl.'s Mot. for Part. Summ. J. Ex. L (Photographs of Boom, Georgia), Doc. Nos. 43-14 & 43-15). He surmised—and experts later confirmed—that the cable had broken loose from the plastic zip ties and rubbed against the boom, wearing away paint and metal. (Wilkinson Dep. 25:4–13, 34:7–17;[3] Watson Dep. 37:16–21; Goodwin Dep. 31:12–20; Pl.'s Mot. for Part. Summ. J. Ex. K (Rowe Dep.) 8:1–6, Doc. No. 43-23; Ex. N (Shores Memo), Doc. No. 43-18).

Wilkinson called his supervisor and reported the damage. (Wilkinson Dep. 68:24–69:11). The worn spot on the boom made it unsafe for use, and Dozier Crane would have

---

[3] Wilkinson testified that it was a "jib insert" that was damaged with the rub mark, (id. 22:3–23:22) but the parties appear to agree that this part is called a boom. I will therefore refer to it as a boom for the purposes of this Memorandum and Order.

to order a replacement.  (Pl.'s Mot. for Part. Summ. J. Ex. O (Kobelco Bulletin), Doc. No. 43-19 (warning that damage that reduces a metal strut's radius by more than eleven percent is irreparable); Ex. M (Brack Dep.) 10–25, Doc. No. 43-17 (explaining that he measured the struts of the boom and the radius had been reduced by more than eleven percent), Ex. N (Shores Memo), Doc. No. 43-18, Ex. P (Heavy Iron, LLC Estimate, Apr. 15, 2014), Doc. No. 43-20).

Dozier Crane's employee Rhonda Barkley emailed one of the defendant's claims adjusters, Vicki Witter, about the damage.  (Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. P (Emails between Barkley and Witter, Apr. 4, 2014), Doc. No. 57-15 (describing the damage, to which Witter responded with follow-up questions).  The defendant then investigated the incident.  (Id. Ex. Q (Witter's Claims Log), Doc. No. 57-16 (describing the arrangement of an investigation into the damage)).  At the conclusion of the investigation, Dozier Crane sent the defendant an estimate that stated that the cost of replacing the damaged parts was $59,994.75.  (Id., Ex. R (Estimate by Heavy Iron, LLC, Apr. 15, 2014), Doc. No. 57-17; Witter's Claims Log, Doc. No. 57-16 (noting the estimated cost)).

Dozier Crane filed a claim with its insurer, Plaintiff Alterra America Insurance Company, which now brings this action under the Carmack Amendment as Dozier Crane's subrogee.

### STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). A dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For a dispute to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

A party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party asserting that a fact cannot be genuinely disputed must support the assertion by citing relevant portions of the record, including depositions, documents, affidavits, or declarations, or showing that the materials cited do not establish a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson, 477 U.S. at 252.

In reviewing a motion for summary judgment, the court does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion. Siegel Transfer v. Carrier Express, 54 F.3d 1125, 1127 (3d. Cir. 1995); Anderson, 477 U.S. at 255 (explaining that the court must draw "all justifiable inferences" in favor of the nonmoving party). The nonmoving party, however, cannot avert summary judgment with speculation or conclusory allegations; rather it must

present clear evidence from which a jury can reasonably find in its favor.  <u>Ridgewood</u>

<u>Bd. of Educ. v. N.E. for M.E.</u>, 172 F.3d 238, 252 (3d Cir. 1999).

## DISCUSSION

The Carmack Amendment to the Interstate Commerce Act makes interstate

carriers strictly liable to the shipper for damages to the property they transport unless they

can prove certain defenses.  <u>See</u> 49 U.S.C. § 14706[4]; <u>Certain Underwriters at Lloyd's of</u>

<u>London v. UPS of Am., Inc.</u>, 762 F.3d 332, 335 (3d Cir. 2014).  The plaintiff moves for

summary judgment against the defendant carrier on its *prima facie* case under the

Carmack Amendment, arguing that there is no genuine dispute that the boom the carrier

transported was damaged during the trip.  The defendant opposes the plaintiff's motion

and moves for summary judgment in its own right, arguing that the plaintiff has not

presented sufficient evidence for a reasonable jury to conclude that the damage occurred

during, rather than before, the boom was transported; that it is entitled to judgment as a

matter of law on its "act of shipper" defense; that the plaintiff did not satisfy the Carmack

Amendment's notice requirement; that the plaintiff did not suffer an injury; and that

damages are limited by the defendant's tariff.

I conclude that the record before me does not support the defendant's arguments.

Rather, I hold that the plaintiff is entitled to summary judgment on its *prima facie* case,

---

[4] The Amendment provides that "[a] carrier providing transportation or service . . . shall
issue a receipt or bill of lading for property it receives for transportation under this part.  That
carrier and any other carrier that delivers the property and is providing transportation or service
. . . are liable to the person entitled to recover under the receipt or bill of lading."  49 U.S.C. §
14760(a)(1).

and the parties are permitted to proceed to trial on the issues raised in the defendant's motion, as well as any other applicable defenses.

## I.   *Prima Facie* Case

"To establish a *prima facie* case against a carrier under the Carmack Amendment, a shipper must prove (1) delivery of goods to the initial carrier in good condition, (2) damage of the goods before delivery to their final destination, and (3) amount of the damages." Paper Magic Group, Inc. v. J. B. Hunt Transp., Inc., 318 F.3d 458, 461 (3d Cir. 2003). The parties agree that the plaintiff has presented uncontroverted evidence supporting the second and third elements, but the defendant challenges the plaintiff's ability to show that there is no dispute about the first element—that the parts were delivered to the defendant in good condition.[5]

On the evidence before me, I find that there is no genuine dispute about the first element either. The plaintiff presents uncontroverted evidence from Steven Wilkinson that the boom was not damaged when he picked it up in Iowa. (Wilkinson Dep. 12:23–13:4.) His inspection in Grimes consisted of "looking at it [and] walking all the way around it." Id. 13:20–14:13. When he was strapping the boom to his truck, he looked at it again. Id. "There was no bends, no cuts, nothing like that in it." Id. When he made the second stop in Swisher, Iowa, he further handled the boom in order to attach additional equipment, and again saw no defects. Id. 15:4–15. He signed the bill of lading

---

[5] On this basis, the defendant both opposes the plaintiff's motion for summary judgment on its *prima facie* case and even moves for summary judgment in its own right, arguing that the plaintiff's evidence on this issue is insufficient for a reasonable jury to find in the plaintiff's favor.

without noting any damage because "there was nothing other than normal scratches and rust and stuff . . . . Nothing was damaged." Id. 77:23–78:22. The photos he took of the parts on his truck in Iowa do not reveal any damage. (Id. 19:11–16; Pl.'s Mot. for Part. Summ. J. Ex. J (Photographs of Boom, Iowa), Doc. Nos. 43-12 & 43-13).

When he reached South Carolina three days later and removed some of the parts from his truck, he saw a black "rub mark" on the otherwise yellow-painted boom. (Id. Ex. L (Photographs of Boom, Georgia), Doc. Nos. 43-24 & 43-15; Wilkinson Dep. 36:18–21). He called his supervisor and reported the damage. Id. 68:24–69:11. He then delivered the boom to one of Dozier Crane's customers in Pooler, Georgia. When the customer saw the boom, he noted "an obvious fresh rub mark where the paint had been rubbed off down to the bare metal and it was shiny bare metal so it was—you know, appeared to have just happened." (Rowe Dep. 8:1–6).

The defendant argues that this evidence does not conclusively show that the boom was in good condition when Wilkinson loaded it in Grimes; rather, it argues that a reasonable jury could conclude that Wilkinson did not notice the damage before the trip because the damage could not be observed without specialized inspection. But the testimony that the defendant uses to support its argument is not about a boom's hidden damage. The testimony of RTL's corporate representative, Mark Watson, is about the proper way to evaluate the damage that occurred after the travel. He was asked the following question:

> Q: And I think you said earlier, to your mind the photographs weren't good enough to allow you to determine how badly damaged the boom was?

(Watson Dep. 57:2–4.)  At this point in Watson's testimony, there had been no discussion of the boom being damaged before the trip.  It is therefore clear that this question refers to the damage observed after the trip.  Mr. Watson responded:

> A: That is correct. A photograph—you cannot determine that information from photographs.  You would have to put say a straight edge on it.
>
> Q. A straight edge on the area of the damage?
>
> A. Yeah. What the proper method of determining the damage is to remove all the paint because the paint is painted on several times for thickness.  Remove all the paint to get down to the metal, then put a straight edge on it to determine when the tolerance would be.  I believe the tolerance on that is one millimeter to determine whether there needs to be repairs done to it. But you have to get down to bare metal, you can't do it from the paint. From the pictures you sent, they did not do that.

Id. 57:4–19.  Watson's testimony does not support the defendant's argument that the parts could not be found to be in good condition before the trip because they had not been properly inspected, because Watson was testifying only to the method for properly evaluating the extent of an observable defect.

In addition to mischaracterizing Watson's testimony, the defendant relies on speculation about what could have happened to the parts before Wilkinson received them. For example, the defendant identifies the testimony from Dozier Crane's corporate representative stating that it is possible for "flat spotting"—the kind of damage that occurred here—to be minimal enough so as not to be irreparable.  (Goodwin Dep. 81:15–19).  But the defendant presents no evidence that such damage occurred at any point in the fourteen month chronicle it gives of the boom's life before Wilkinson picked it up in

April 2014.  To successfully oppose a motion for summary judgment, a defendant cannot rely on conclusory statements or speculation, as the defendant does here.  Ridgewood Bd. of Educ., 172 F.3d at 252.

In response to the plaintiff's well-supported motion for summary judgment on its *prima facie* case, the defendant presents no clear evidence from which a jury could find in its favor.  I will therefore grant the plaintiff's motion for partial summary judgment.

## II.    "Act of Shipper" Defense

Once the plaintiff has established a *prima facie* case under the Carmack Amendment, the "burden shifts to the carrier to prove that it was free from negligence and that the damage was caused solely by" one of several possibilities, including an "act of the shipper himself."  Beta Spawn, Inc. v. FFE Transp. Servs., 250 F.3d 218, 226 (3d Cir. 2001) (quoting Mo. Pac. R.R Co. v. Elmore & Stahl, 377 U.S. 134, 137 (1964)).  The defendant contends that there is no dispute that Wilkinson was not negligent and the damage was instead caused by RTL's failure to properly secure the parts to each other before shipment, and thus that it is entitled to judgment as a matter of law on this defense. (Def.'s Mot. for Summ. J. 17–21.)  But I find that there are genuine disputes as to whether Wilkinson was negligent in accepting the poorly secured shipment and not adding additional fasteners to the load.

To be entitled to summary judgment on its "act of shipper" defense, the defendant must show that no reasonable jury could conclude that Wilkinson was negligent.  Beta Spawn, Inc., 250 F.3d at 226; Mo. Pac. R.R. Co., 377 U.S. at 137–38 (explaining that the defenses originally derive from common law).  At common law, a person is negligent if

he did not exercise the care that "a reasonable [person] in his position, with his information and competence, would recognize as necessary to prevent the act from creating an unreasonable risk of harm to another." Restatement (Second) of Torts § 298. Negligent conduct includes not just unreasonable acts but also "a failure to do an act which is necessary for the protection or assistance of another and which the actor is under a duty to do." Id. § 284; see also id. § 323.

Federal regulations impose a duty on drivers to check that cargo is properly secured. 49 C.F.R. 392.9 ("Inspection of Cargo, Cargo Securement Devices and Systems"). "A driver may not operate a commercial motor vehicle . . . unless – [its] cargo is properly distributed and adequately secured." Id. "A truck driver must "[a]ssure himself/herself that [the cargo is properly secured] before he/she drives that commercial motor vehicle." Id. He or she must regularly inspect the cargo and "cause any adjustments to be made to the cargo or load securement devices as necessary, including adding more securement devices, to ensure that cargo cannot shift on or within, or fall from" the truck. Id.

Where the shipper, rather than the carrier, secures the load, a carrier can still be liable for any resulting damage if the shipper's negligent work was "obvious or apparent" to the carrier. United States v. Savage Truck Line, Inc., 209 F.2d 442, 445 (4th Cir. 1953) ("When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper."); Gen.

Elec. Co. v. Moretz, 270 F.2d 780, 784–85 (4th Cir. 1959); Pierce v. Cub Cadet Corp., No. 87-5936, 1989 U.S. App. LEXIS 14626 at *9–10 (6th Cir. May 9, 1989); Armour Research Found. v. Chi., R.I. & P.R. Co., 297 F.2d 176, 178 (7th Cir. 1961); Zwolak v. Phx. Steel Serv., No. 12-CV-00910F, 2015 U.S. Dist. LEXIS 139922, at *19 (W.D.N.Y. Oct. 14, 2015). Where the shipper also has a duty to properly package or secure the load, this does not "absolve the carrier or its driver of [its similar] responsibility to assure the stability of the load during transport." Spence v. ESAB Grp., Inc., 623 F.3d 212, 219 (3d Cir. 2010) (applying Pennsylvania law, which follows the Restatement (Second) of Torts).

There is evidence from which a reasonable jury could conclude that Wilkinson was negligent in failing to further secure the load after he noticed what he believed to be inadequate fastenings. When Wilkinson loaded the parts onto his truck, he saw that the zip ties did not appear to be big enough to hold the cable. (Wilkinson Dep. 17:2–11, 39:10–20.) He told the RTL employees about his concern, and they reportedly replied, "That's the way we always do it." Id. 39:17. He doubted that RTL had properly secured the parts, but he did not argue with the employees. Commenting on the size of the cable, he explained,

> A: Plastic shit ain't gonna hold it, that's all there is to it. And when you explain that to somebody and they look at you like you're a lunatic and a dumbass truck driver, you let it fall so that you get the load. Otherwise, they're gonna start screaming and yelling, and we're not allowed to argue with a customer.
>
> . . . .

A:  That's a wire tie [i.e., for securing wires].  That's what they had this cable held with against the pipe.

Q:  Well, are you saying that was the right way to secure it or the wrong way to secure it?

. . . .

A:  Commonsense tells me that's not the proper way to [secure the cable]. . . . But when you're dealing with somebody that does this every day and that's what they get paid for, you gotta take their word for it.  And they told me that's the way to do it.  Me, I'd have used a big, old piece of wire.

(Id. at 17:8–19:4; see also id. at 44:20–45:7 ("[W]hen you tell somebody that you don't think the wire ties are strong enough and they tell you, 'That's the way we always do it,' there's no arguing.  You let it go.")).  Wilkinson frequently checked that the load was secure, but did not notice that the cable was detached until he reached South Carolina. Id. at 43:10–15, 48:21–49:24, 52:2–53:14.

From this evidence, a reasonable jury could conclude that the inadequate attachment of the cable to the boom was apparent, that Wilkinson was aware of it, and that further securing the cable was necessary for the property's protection.  Based on the record before me, a reasonable jury could conclude that Wilkinson unreasonably relied on the RTL employees' work and advice, and thus that his decision not to further secure the cable was a dereliction of his duties under federal and common law.

The defendant contends that RTL, not Wilkinson, was responsible for securing the parts before they were loaded onto the truck.  The defendant points to the testimony of RTL's corporate representative, Mark Watson, in which he states that "securing the

pendant to the boom in transit is something that RTL does as part of its normal business." (Watson Dep. 18:14–19). Watson agreed that RTL's employees were responsible for and trained in "securing pieces to pieces" to prepare parts for shipment. Id. 33:1–34:13, 50:15–23. The defendant also points out that it had a tariff in place that it incorporated into the bill of lading applicable to the boom's transportation. (Grimes Bill of Lading, Doc. No. 53-4). It provided that "all freight loaded by the shipper shall be properly packed, braced, and blocked on motor vehicle [sic] by the shipper to protect against damage during the course of normal transportation." (Def.'s Mot. for Summ. J. Ex. C. (Tariff Item 680-10, Packing Requirements, effective Mar. 1, 2012), Doc. No. 53-3.)

But while the evidence the defendant identifies could support a finding that RTL had a duty to properly secure the parts, it does not show that this duty necessarily relieved Wilkinson, acting on the defendant's behalf, of his own duty to secure the load before driving the truck. Therefore, the defendant is not entitled to summary judgment on this defense.

## III.   <u>Notice of Claim</u>

The defendant argues the plaintiff failed to satisfy the Carmack Amendment's notice requirement, which is a prerequisite to filing a claim. I agree with the plaintiff that it has presented sufficient evidence showing that it satisfied the notice regulation's requirements, and therefore the defendant is not entitled to summary judgment on this basis.

The Carmack Amendment's notice regulation provides that a carrier shall voluntarily pay a claim only if the claimant files a "written or electronic communication

(when agreed to by the carrier and shipper or receiver involved)" with the carrier that "contain[s] facts sufficient to identify the baggage or shipment," "[a]sserts liability for alleged loss, damage, injury, or delay," and "[m]ak[es] claim for the payment of a specified or determinable amount of money." 49 C.F.R. § 370.3. "[T]he filing of a written claim within the prescribed period is a strict condition precedent to the filing of a lawsuit." S&H Hardware & Supply Co. v. Yellow Transp., Inc., 432 F. 3d 550, 554 n.1 (3d Cir. 2005). "Courts have construed the written claim requirement liberally . . . and the standard for determining sufficiency is one of substantial performance." Id. at 550. "The purpose of the written claim requirement is to insure that the carrier may promptly investigate claims, and not to permit the carrier to escape liability. . . . The crux of the notice under § 370.3(b) is whether it apprises the carrier of the basis for the claim and that reimbursement will be sought." Lewis v. Atlas Van Lines, Inc., 542 F.3d 403, 411 (3d Cir. 2008) (quoting S&H Hardware & Supply Co., 432 F.3d at 554) (internal quotation marks and alterations omitted).

The plaintiff argues that it satisfied the notice regulation's requirements because Dozier Crane sent the defendant both a set of emails beginning the day it learned of the damage as well as a formal letter three months later from National Subrogation Services (NSS), the plaintiff's third party administrator, requesting compensation.

### A. The Emails

The plaintiff presents evidence showing that the emails contained the necessary information to satisfy the notice requirement, and that these emails constitute valid notice of the claim because the parties agreed to communicate claims electronically.

15

The emails contained the necessary information to satisfy the notice requirement because, taken together, they identified the damage, asserted liability, and claimed a determinable amount of money. On the day the damage was discovered, Rhonda Barkley of Dozier Crane emailed Vicki Witter, the defendant's claims adjuster, explaining that the delivered boom was damaged and stating that "[a]fter all the damages are inspected, we will have a better idea if it can be repaired, or replaced." (Emails between Barkley and Witter, Doc. No. 57-15.) The defendant then initiated an investigation into the incident as a result of the email. (Witter's Claims Log, Doc. No. 57-16 (describing the arrangement of an investigation into the damage).) At the conclusion of the investigation, Dozier Crane sent the defendant an estimate that stated that the cost of replacing the damaged parts was $59,994.75. (Id. Ex. R (Heavy Iron, LLC Estimate, Apr. 15, 2014), Doc. No. 57-17; Witter's Claims Log, Doc. No. 57-16 (noting the estimated cost)).

Because the emails are electronic communications, the plaintiff must also show that the parties agreed to communicate claims electronically. 49 C.F.R. § 370.3; Raineri v. N. Am. Van Lines, Inc., 906 F. Supp. 2d 334, 342 (D.N.J. 2012). In Raineri v. North American Van Lines, the court held that the carrier and the shipper did not agree to communicate claims electronically because the carrier repeatedly rejected the shipper's attempts to do so. Id. at 343. In that case, the bill of lading required the shipper to use one of the carrier's claim forms to submit a claim. Id. After the shipper attempted to email her claim, the carrier repeatedly told the shipper that she had to fill out a claim form, which was available on the carrier's website, before it would process her claim. Id.

at 338–39, 343.  Given this exchange, the court concluded that the carrier had not agreed to consider emails to be claims.  Id.  The court then further considered whether emails sent to the carrier nonetheless gave the carrier an adequate opportunity to investigate the claims.  Id. at 343–44.  It found that they did not.  Id.

Unlike in Ranieri, the plaintiff here presents sufficient evidence supporting its argument that the parties agreed to communicate claims by email.  There is evidence that the parties used email for important business communications prior to the shipment's delivery.  (Pl.'s Br. in Opp. Def.'s Mot. Summ. J., Ex. G (Emails between Barkley and Croll, Mar. 31, 2014), Doc. No. 57-7 (arranging logistics and price of the shipment)).  After delivery of the shipment, Dozier Crane immediately alerted the defendant to the damage by email.  (Emails between Barkley and Witter, Doc. No. 57-15 (describing the damage, to which Witter responded with a follow-up questions)).  In contrast to the defendant in Raineri, the defendant here provides no evidence that it told Dozier Crane that the email was inadequate to constitute a claim for damage.  Instead, it began investigating the claim.  Thus, there is also sufficient evidence to support a finding that the defendant's decision not to object earlier—to, in fact, treat the email exchange as a proper claim—constitutes an agreement to communicate claims electronically.  These communications are evidence that could satisfy the notice requirement.

### B.     The NSS Letter

Second, the plaintiff presents evidence that it satisfied the notice requirement when its third party claims adjuster, NSS, sent a letter to the defendant.  (First Am. Compl. Ex. C (NSS Letter, July 18, 2014)).  The letter describes the date and location of

the loss, clearly asserts liability against the defendant, and requests a precise dollar-amount in damages.

The defendant argues that this letter fails to satisfy the regulation's requirements for two reasons. First, it argues it fails because it did not come from the plaintiff, Alterra America Insurance Company, or Dozier Crane, but from a company called "Alterra Specialty Insurance Company." (Def.'s Mot. for Summ. J. 9). But the letter states clearly at the top that it is "Regarding: Insured: Dozier Crane & Machinery Inc." for loss that occurred on April 4, 2014 in Pooler, Georgia. The letter clearly suggests that Alterra Specialty Insurance Company was acting as the plaintiff's agent in this matter. This use of a slightly different corporate name did not deny the defendant adequate notice of the claim.

Second, the defendant argues that the letter fails to satisfy the regulation's requirements because it does not request "a specified or determinable amount of money." 49 C.F.R. § 370.3(b)(3). The Court of Appeals has determined that a claim "need not include any dollar amount at all. Instead, all that is required is that the claim provide enough information to make it possible to assign a dollar amount to the claim at some point after the claim itself is filed." Lewis v. Atlas Van Lines, Inc., 542 F.3d 403, 409 (3d Cir. 2008) (holding that a request for "loss of profit on the sale of [the plaintiffs'] residence" to be determined after the home's sale was sufficiently determinable, while "miscellaneous expenses" were not).

The defendant argues that the claimed amount in the letter was indeterminable because it divides the damages into two categories—"Amount of Paid Claim:

$56,939.63" and "Plus Deductible: $3,055.12." (Def.'s Mot. for Summ. J. 10–12.) The defendant argues that "[t]he smaller amount, identified as 'plus deductible,' is offered as a dollar figure, but it is unclear whether that amount should be added to the amount of the paid claim . . . or should otherwise be accounted for by deducting it from the amount of the paid claim . . . ." Id. The defendant's argument is at best pedantic and at worst frivolous. In making it, the defendant claims ignorance of the fact that a deductible is merely the portion of the damages for which the insurer did not compensate the insured, not an amount to be subtracted from the total paid by the insurer to determine the defendant's liability. Thus, even if it were not for the emails that preceded the NSS letter, the letter itself satisfied the notice regulation's requirements.

## IV. __Injury__

The defendant argues that the plaintiff has not presented evidence that it sustained an injury, as required to have standing to bring a claim under Article III of the U.S. Constitution. The defendant points out that, while the plaintiff in this case is "Alterra America Insurance Company," payment of Dozier's claim was made by "Alterra E&S Insurance Company." But the plaintiff presents evidence that Markel Corporation owned both Alterra America and Alterra E&S and was using Alterra E&S to pay Alterra America's claims, which Alterra America then repaid to Alterra E&S. (Pl.'s Br. in Opp. to Def. Mot. Summ. J. Ex. S (Lassiter Affidavit, July 6, 2016), Doc. No. 57-18[6]). This evidence supports a finding that the plaintiff suffered an injury.

---

[6] In its Motion to Strike the Plaintiff's Brief in Opposition to the Defendant's Motion for Summary Judgment, Doc. No. 59, the defendant argues that this affidavit should not be

## V.    Damages Limitation

The defendant argues that damages in this case are limited to $5,000 per ton of cargo transported under a tariff incorporated into the bill of lading.  (Def.'s Mot. for Summ. J. 24.)  The defendant has not shown, however, that there are no disputes of material fact with regard to the enforceability of the tariff.[7]

Tariffs—a written declaration of a carrier's rates that could be publicly posted—are the remnant of a preexisting law that required such records limiting liability to be filed with the Interstate Commerce Commission (ICC).  Emerson Elec. Supply Co. v. Estes Express Lines Corp., 451 F.3d 179, 184–85 (3d Cir. 2006).  Under this system, a tariff could be enforced against a shipper under a theory of constructive notice.  Tempel Steel Corp. v. Landstar Inway, Inc., 211 F.3d 1029, 1031 (7th Cir. 2000).  In 1995, Congress replaced the requirement that tariffs be filed with the ICC with a provision that carriers could limit liability by either agreement of the shipper or a written declaration.

---

considered on summary judgment because it is hearsay.  Affidavits and declarations considered on summary judgment must, "set out facts that would be admissible in evidence . . . ."  Fed. R. Civ. P. 56(c)(4).  Hearsay statements are inadmissible.  Fed. R. Evid. 802; Gonzalez v. Sec'y of Dep't of Homeland Sec., 678 F.3d 254, 262 (3d Cir. 2012).  This affidavit, however, is not hearsay because it is based on personal knowledge.  In it, Courtney Lassiter states that she is an accounting manager at Markel Corporation.  (Doc. No. 57-18 ¶ 3.)  She explains that her accounting department was responsible for overseeing the accounting functions for Alterra America Insurance Company and Alterra E & S Insurance Company.  Id. ¶ 6.  Therefore, she had sufficient personal knowledge of the relationship between Alterra America and Alterra E & S to testify that one company paid the other's claims.  Id. ¶ 5.

[7] The defendant does not argue that the terms of the bill of lading itself limit the plaintiff's recoverable damages.  The bill of lading that Wilkinson signed in Grimes, Iowa stated that "[u]nless a greater value is declared by the shipper, and stated on this bill of lading, the carriers [sic] liability for loss or damage to any package or article shall not exceed $5,000 per ton of 2,000 pounds, actual weight, in accordance with tariff provisions that govern."  (Grimes Bill of Lading, Doc. No. 53-4).

49 U.S.C. § 14706(c)(1)(A); <u>Emerson Elec. Supply Co.</u>, 451 F.3d at 185–86.  Even when

limiting liability by written declaration, however, courts have held that the carrier must

obtain the shipper's choice as between at least two levels of liability.  <u>Id.</u> at 186.  The

carrier must show that it:

> (1) provided, upon the shipper's request, a written copy of the bases for its rate;

> (2) gave the shipper a reasonable opportunity to choose between two or more
>     levels of liability;

> (3) obtained the shipper's agreement as to the shipper's choice of liability; and

> (4) issued a receipt or bill of lading prior to moving the shipment.

<u>Id.</u>; <u>Diamond Transp. Group, Inc. v. Emerald Logistics Solutions, Inc.</u>, No. 05-3828,

2006 U.S. Dist. LEXIS 42918, at *8–9 (E.D. Pa. June 21, 2006).

"Only by granting its customers a fair opportunity to choose between higher or

lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully

limit recovery to an amount less than the actual loss sustained."  <u>Emerson</u>, 451 F.3d at

188 (quoting <u>New York, New Haven & Hartford R.R. v. Nothnagle</u>, 346 U.S. 128, 134

(1953)).  "A fair opportunity means that the shipper had both reasonable notice of the

liability limitation and the opportunity to obtain information necessary to making a

deliberate and well-informed choice."  <u>Hughes v. United Van Lines, Inc.</u>, 829 F.2d 1407,

1419 (7th Cir. 1987), <u>superseded by statute on other grounds</u>; <u>Tempel Steel Corp.</u>, 211

F.3d at 1031 (explaining that it is "hard to envisage how a shipper can be said to agree to

a limitation of liability of which it lacked actual knowledge").  Thus, "the carrier and the

shipper must have a written agreement that is sufficiently specific to manifest that the

shipper in fact agreed to a limitation of liability.  A carrier cannot limit liability by

implication.  There must be an absolute, deliberate and well-informed choice by the

shipper." <u>ABB Inc. v. CSX Transp., Inc.</u>, 721 F.3d 135, 142 (4th Cir. 2013) (internal

quotations and alterations omitted); <u>see also</u> <u>Menora Mivtachim Ins. Ltd. v. New Century</u>

<u>Transp., Inc.</u>, No. 12-5189, 2014 U.S. Dist. LEXIS 16952, at *7 (D.N.J. Feb. 11, 2014)

("[T]he bill of lading contained no rates on its face and makes no reference to any

document containing two or more levels of liability" and so it was not entitled to its

protection as a matter of law).

　　　　The defendant relies on the reference to the tariff in the bills of lading to support

its motion for summary judgment on its right to a damages limitation.  But it does not

present evidence showing that there is no genuine dispute that it satisfied all the

requirements necessary for a tariff to be enforceable.  The bills of lading that Wilkinson

signed in Grimes and Swisher, Iowa, each stated that the carrier was receiving the listed

items "subject to the classifications and tariffs in effect on the date of the issue of this Bill

of Lading," and that the "[s]hipper hereby certifies that he is familiar with all the terms

and conditions of the said bill of lading, including those . . . in the classification or tariff

which governs the transportation of this shipment, and terms and conditions are agreed to

by the shipper and accepted for himself and his assigns."  (Grimes Bill of Lading, Doc.

No. 53-4; Pl.'s Mot. for Part. Summ. J. Ex. E (Swisher Bills of Lading), Doc. Nos. 43-8

& 43-9).  The defendant argues that, at the time, it had an effective tariff in place that

limited its liability to $5,000 per ton of cargo weight. (Tariff: Released Value—Released Rates, Doc. No. 53-5).[8]

The defendant has not presented evidence as to several issues respecting the enforceability of its tariff, including whether Dozier Crane requested a written copy of the base for its rate and the defendant provided it, whether Dozier Crane had a reasonable opportunity to choose between two or more levels of liability, and whether Dozier Crane made such a choice. (Def.'s Mot. for Summ. J. 24.) On the contrary, the plaintiff presents evidence that Dozier Crane representatives were unaware of the tariff, (Goodin Dep. 10:24–11:23) and further, that they required the defendant to provide certificates of insurance confirming liability for up to $1.5 million. Id. 15:2–16:24. Thus, disputes of material fact remain that affect whether the damages limitation is enforceable. I will deny the defendant's motion for summary judgment on this issue.

## CONCLUSION

I will grant the plaintiff's motion for partial summary judgment as to its *prima facie* case, and deny the defendant's motion for summary judgment.[9]

An appropriate Order follows.

---

[8] The defendant states, without a citation, that the boom's declared weight was 3,000 pounds. (Def.'s Mot. for Summ. J. 24.)

[9] The defendant also argues that it is entitled to summary judgment with respect to the plaintiff's common law claims against it, as they are preempted by the Carmack Amendment. The plaintiff, however, has not brought any common law claims against the defendant. (Sec. Am. Compl. pp. 5–6 (bringing claims in negligence and breach of contract against former-defendant RTL only).)